**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

REBECCA HOWELL,

       Plaintiff,

v.                                               No. CIV 11-519 LFG

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff Rebecca Howell's ("Howell") Motion to Reverse or Remand the Administrative Decision, filed November 17, 2011. [Doc. 19, 20.] The Commissioner of Social Security issued a final decision denying benefits, finding that Howell was not disabled and, therefore, not entitled to Supplemental Security Income ("SSI") benefits. The Commissioner filed a response to Howell's Motion [Doc. 21], and Howell filed a reply [Doc. 22]. Based on alleged errors by the ALJ, Howell argues that additional fact finding would serve no useful purpose and that outright reversal for an immediate award of benefits is warranted. [Doc. 20, at 18.] Howell contends, at a minimum, that the case should be remanded for further evaluation of the evidence. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court grants Howell's motion for an immediate award of benefits, for the period of October 9, 2007 to December 1, 2009. The Court's reasoning follows.

1

I.   **PROCEDURAL RECORD**

On October 9, 2007, Howell applied for SSI [AR 11, 124], initially alleging she was disabled since July 1, 2006 [AR 124], due to "right foot stress reaction," degenerative discs, and "referrals."[1] [AR 163.] Howell claimed she had trouble walking, swelling in her foot, constant back pain, trouble lifting objects, and could only walk short distances. [AR 163.] Her attorney summarized her medical history as having severe back, knee, and foot problems, along with a history of hernias and an adrenal mass. [Doc. 20, at 2.] Howell's SSI application was denied at the initial and reconsideration levels. [AR 46.]

On December 2, 2009, Howell filed a subsequent application for SSI that was granted. In a notice dated June 2, 2010, the application was approved beginning on December 2, 2009. Thus, this appeal relates to the time period of October 9, 2007 to December 1, 2009. [AR 11.]

On August 18, 2009, the ALJ conducted a video administrative hearing, lasting 20 minutes, from Fort Worth, Texas. Howell, along with her non-attorney representative, appeared in Santa Fe, New Mexico. [AR 46, 58.] On October 20, 2009, the ALJ issued a decision finding Howell not disabled. [AR 46.] Thereafter, Howell filed a request for review. After review of additional evidence and consideration that Howell's subsequent application for benefits was granted (effective December 1, 2009), the Appeals Council denied Howell's request for review on May 19, 2011. The Appeals Council determined neither the additional medical evidence nor the subsequent finding of disability warranted a change in the ALJ's decision. [AR 1, 2, 4, 11.] On June 15, 2011, Howell filed a Complaint for court review of the ALJ's decision. [Doc. 3.]

---

[1]It is not clear but the word "referrals" may be a typographical error. Howell suffered from recurring hernias.

2

Howell was born on December 9, 1959 [AR 124], and was 49 years old at the time of the hearing.  She and her two young daughters, ages 4 and 8, live in El Prado, New Mexico, in a mobile home or friend's home.  Howell is not married.  [AR 60.] She has a high school education and three years of college as of 2006. [AR 11, 169.] She was hoping to attain a college degree in psychology. [AR 411.]

Howell worked as a cabinet maker assistant and a housekeeper.  Her work history, however, is spotty with unexplained gaps. [AR 153.] She stated that she was unable to work because of medical conditions as of July 2006, but that she stopped working on December 31, 1995, due to unexplained conditions not related to medical issues. [AR 163.] Her earnings records indicate she made $709.72 in 1976, that the highest annual salaries ranged from $14,748 to $20,408 between 1983 and 1986, that she made between $3,000 and $6,000 between 1989 and 1992, that she earned $10,328 in 1994 and $8891.40 in 1995. [AR 129.]  Howell has no earning records after 1995.

Prior to moving to New Mexico, Howell lived in San Diego.  She alleges a boyfriend beat her up while in San Diego and that she became homeless for some period of time. [AR 62.] Howell is a heavy smoker [AR 251], and has an "unusual tattoo between her eyes." [AR 281.]

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, she is capable of performing other work.[9]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy.

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

In this case, the ALJ determined at step five that the grids directed a finding of "not disabled" based on Howell's ability to perform a full range of sedentary work, along with her age, education, and work experience. [AR 53.]

## III.   **STANDARD OF REVIEW**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of entire record" [AR 48], the ALJ denied Howell's request for SSI.  [AR 46-54.]  The ALJ determined Howell had not engaged in substantial gainful activity since October 9, 2007, the application date.  The ALJ found that Howell had the following severe impairments: "status post multiple herniorrhaphies [hernia repairs], status post laparoscopic assisted adrenalectomy, scoliosis, multi-level degenerative disc disease/degenerative joint disease of the lumbar spine, mild midfoot degenerative joint disease and bunion on right foot, and hypertension."  Notably, the ALJ did not find any allegations of pain to be a severe impairment at step two.  [AR 48.]  The ALJ further found that none of Howell's impairments or combination of impairments met listing criteria, specific to 1.02, 1.04, 4.00, "or any other appropriate section." [AR 48.]

With respect to Howell's RFC, the ALJ determined that she retained the ability to perform "the full range of sedentary work . . ., i.e., sitting approximately 6 hours out of an 8-hour day; standing and/or walking less than 2 hours out of an 8-hour day; lifting/carrying no more than 10 pounds and occasionally less; and the freedom to occasionally change sitting/standing positions at

the worksite while in the performance of job duties." [AR 48-49.]  The ALJ also found that Howell's impairments could reasonably be expected to produce the alleged symptoms but that "the record does not establish the presence of a medically determinable impairment that would prevent her from engaging in substantial gainful work activity at the least strenuous of the exertional levels," *i.e.,* sedentary work.  [AR 52.]  The ALJ did not expressly state that he found Howell's not credible.

The ALJ decided that Howell was not capable of returning to her prior relevant work as a cabinet maker assistant or housekeeper. [AR 52.]  At step five, the ALJ determined the grids directed a finding of "not disabled." [AR 53.]

IV.  **MEDICAL HISTORY/BACKGROUND**

There are a few medical records as early as 2001 and 2002. [*See e.g.,* AR 420, 426, 427, 496, 485.] Howell complained of some problems with her spine, right foot, and left knee in 2002.  She had knee ACL reconstruction in early 2000. [AR 339.]  However, the majority of Howell's many medical records are from September, 2006-2009, which document Howell's repeated physical problems, surgeries, use of narcotic pain medications, allegations of pain, and testing.  Howell was not employed during any of these years, although she was attending college for some of 2006-2007, and she cared for her two young daughters.  Her housing and living situation often sounded precarious; she lived "off the grid," at least part of the time, requiring her to lift and carry heavy buckets of water and chop wood for heat. [AR 409, 412.] She received income assistance and food stamps, but was sometimes required to work a certain number of hours to continue receiving certain benefits. [AR 321, 344-46, 502.]

### *2006 Medical Records*

Although the Court made a thorough review of Howell's many medical, therapy, and disability records, it attempts to summarize the number of times she saw certain providers, her diagnoses, treatment, testing results, and/or surgeries.

Howell's primary care physician was Dr. Jemery Kaufman of the Taos Medical Group. From September to December 2006, Howell saw Dr. Kaufman about 7 times and contacted her office by telephone on a number other occasions. [AR 409-415.] Howell complained of hypertension ("HTN"), chronic foot pain and recurring hernias.  It was also discovered that Howell had a left adrenal mass that required surgical removal in early 2007.  She felt a gradual but significant reduction of strength.  She was diagnosed with hyperaldosteronism,[11] and started on a dose of Spironolactone.[12]

Howell had a severe hallux valgus deformity (bunion) on her right foot, and pain and swelling in the metatarsal area.  She suffered from mild arthrosis of the second and fourth tarsometatarsal joints and the first metatarsophalangeal joint. [AR 37.]

Her HTN was treated with high blood pressure medication that Dr. Kaufman adjusted through the years.  Howell also complained to Dr. Kaufman, as well as to her therapist, of chronic lower back pain that was worse on the left side.  The pain made washing dishes more difficult.

---

[11]"Hyperaldosteronism, also aldosteronism,[1] is a medical condition where too much aldosterone is produced by the adrenal glands, which can lead to lowered levels of potassium in the blood." http://en.wikipedia.org/wiki/Hyperaldosteronism (3/20/2012)

[12]"Spironolactone is used to treat certain patients with hyperaldosteronism (the body produces too much aldosterone, a naturally occurring hormone); low potassium levels; and in patients with edema (fluid retention) caused by various conditions, including heart, liver, or kidney disease. Spironolactone is also used alone or with other medications to treat high blood pressure." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000733/ (3/20/2012)

Howell was referred to physical therapy and at first, thought it was helpful, but later did not believe the therapy made any significant change in her pain symptoms. [AR 408.]

Howell had been a heavy smoker for 30 years, smoking one pack a day. Her doctor advised her to quit smoking and at times, Howell stated she wanted to stop smoking and that she was attempting to cut down smoking. However, she never stopped smoking.

At the end of December 2006, Howell was very anxious and afraid that the adrenal mass might be cancerous. She admitted to her therapist that she was drinking again "to take off the edge." [AR 328.] Most other medical records indicate that Howell drank a small to moderate amount of alcohol. At least one medical record in 2007 notes that Howell used recreational drugs in the past. [AR 206.] Another indicates she used crystal "meth" in the past but not presently. [AR 344.]

Dr. Kaufman began prescribing narcotic pain medications for Howell, including Lortab,[13] on at least a monthly basis in November 2006. [AR 409 410, 411, 414.] Dr. Kaufman also urged Howell to take an anti-depressant and see a counselor. Howell attempted taking an anti-depressant but did not like the side effects. She generally resisted taking anti-depressants but saw a counselor on a regular basis.

### *2007 Medical Records*

Howell continued to await a surgery date for removal of the adrenal mass in 2007. If scheduled for surgery, she did not know how she could continue her college plans, and ultimately, she apparently did not obtain her college degree. She was very stressed about the care of her

---

[13]"Lortab contains a combination of acetaminophen and hydrocodone. Hydrocodone is in a group of drugs called opioid pain relievers. An opioid is sometimes called a narcotic. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone." http://www.drugs.com/lortab.html (3/20/2012)

children should the adrenal mass be found malignant, and also complained she had a panic attack in January 2007.  Dr. Kaufman strongly recommended she take an anti-depressant.  It does not appear she followed advice.

During 2007, Howell regularly complained that the pain in her neck and back were worse and repeatedly asked for narcotic pain medication.  For example, the April 11, 2007 medical record indicates Howell had chronic lower back pain and had tried physical therapy and NSAIDs (nonsteroidal inflammatory drugs) without improvement.  She was to see a back pain specialist. Howell also complained of chronic foot pain that had not resolved. [AR 422.]

Dr. Kaufman saw or communicated with Howell on at least a monthly basis.  She prescribed Lortab for Howell on January 4, 2007, January 16, 2007, January 29, 2007, and February 12, 2007. Dr. Kaufman or her associates prescribed Percocet[14] for Howell on February 26, 2007 and February 29, 2007, after the adrenal mass was removed on February 19, 2007. [AR 214.] The mass was benign. [AR 221.]

Dr. Kaufman refilled Howell's prescription for Lortab on March 8, 2007, and prescribed Oxycodone[15] on March 15, 2007. [AR 407, 423.] Dr. Kaufman explained in a March 21, 2007 medical note, that Howell was taking a lot of short acting pain medications because of her complaints of chronic pain in several sites, including her foot, back and abdomen.  Dr. Kaufman

---

[14]"Percocet (oxycodone and acetaminophen) is indicated for the relief of moderate to moderately severe pain."  http://www.rxlist.com/percocet-drug/indications-dosage.htm (3/21/2012).

[15]"Oxycodone is used to relieve moderate to severe pain. Oxycodone is in a class of medications called opiate (narcotic) analgesics. Oxycodone is also available in combination with acetaminophen (Endocet, Percocet, Roxicet, Tylox, others); aspirin (Endodan, Percodan, Roxiprin, others); and ibuprofen (Combunox)." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000589/ (3/21/2012).

believed it was reasonable to prescribe a longer acting pain medication for Howell – MS Contin.[16]

She then hoped to wean Howell off the narcotics, noting that narcotics were not the optimal solution.

However, Dr. Kaufman continued to prescribe narcotic medications on a regular basis and there is

no notation in the medical record of any attempt to reduce Howell's dependence on the opiate

painkillers. [AR 423.] A July 3, 2007 record indicates that Howell did not tolerate MS-Contin well

and would continue with Oxycontin.

Dr. Kaufman prescribed Oxycodone for Howell on April 11, 2007, May 8, 2007, June 5,

2007, July 3, 2007, and OxyContin or Oxycodone (or both) on July 16, 2007, July 31, 2007, August

28, 2007, September 24, 2007, October 22, 2007, and December 12, 2007 (refilled one week early).

[AR 388, 398, 399, 400, 401, 404, 407, 422, 423.]

By February 16, 2007, Howell had completed 16 physical therapy session, but she did not

find that the therapy improved her pain.  The physical therapist believed Howell had progressed

during therapy but discharged her as of Feb. 16. [AR 408, 436.]

Dr. Kaufman continued to change or increase Howell's blood pressure medications in 2007,

to better control her hypertension. [AR 422.]

On April 19, 2007, Howell had an MRI of her thoracic and lumbar spine.  There was mild

central canal stenosis at L4-5 and severe multilevel neural foraminal stenosis at L2-3 and L3-4, with

compression of the right exiting nerve roots.  The report indicated scoliosis with marked

degenerative change and vertebral endplate edema at L3-4.  There was loss of vertebral endplates,

---

[16]MS Contin – "Morphine is used to relieve moderate to severe pain. Morphine long-acting tablets and capsules are only used by patients who are expected to need medication to relieve moderate to severe pain around-the-clock for longer than a few days. Morphine is in a class of medications called opiate (narcotic) analgesics."  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000590/  (3/21/2012).

that could be due to degenerative changes. Howell's thoracic spine was read to have multilevel disc degenerative changes with mild right neural foraminal stenosis[17] at T7-8, T8-9, and T9-10, due to facet osteophytes (bony projections). [AR 487.]

Dr. John Reid, with Taos Orthopaedic Institute, saw Howell in late April 2007, regarding her right foot. She continued to complain of pain and discomfort with weightbearing activities. Dr. Reid reviewed an MRI of the foot that indicated a "stress reaction, bone edema of the 4th and 5th metatarsals," along with stress fractures. Dr. Reid placed Howell in a short leg nonweightbearing cast. [AR 25.] On May 16, 2007, Dr. Reid again saw Howell to follow up on her right foot. She had been feeling "good" while in the cast. She used crutches for weightbearing activities. The cast was removed. Her foot continued to be tender and Dr. Reid recommended she see a foot and ankle specialist. The diagnosis was fractures of the 4th and 5th metatarsals of the right foot. [AR 24.] When Howell was seen at Taos Orthopaedics again in June 2007, she had improved and was walking without pain. [AR 23.]

An osteoporosis screening on June 8, 2007, noted severe levoconvex curvature of the lumbar spine and degenerative change. Howell had osteopenia at L1/L2. [AR 478.]

On July 5, 2007, Dr. Theresa Genovese-Elliott of the Spine and Pain Institute of Santa Fe wrote Dr. Kaufman regarding her evaluation of Howell's chronic back pain. [AR 280.] Howell reported her back pain was constant and related to any type of prolonged position except for sitting. Dr. Elliott's impressions were: multilevel lumbar degenerative changes with severe foraminal

---

[17]"Neural foraminal stenosis refers to compression of a spinal nerve as it leaves the spinal canal through the foramen (the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body)."  http://www.spine-health.com/glossary/n/neural-foraminal-stenosis (3/21/2012)

stenosis on the right at L2/3 and L3/4 with compression of corresponding nerves; marked facet arthropathy bilaterally from L3-4 through L5-S1, and bilateral sacroiliac joint arthritis, symptomatic on the right.  The thoracic MRI scan showed multilevel mild disc bulges but no significant disc herniations.  Dr. Elliott scheduled Howell for a right SI joint injection. [AR 280-81.]

Howell reported to Dr. Kaufman that the injection provided excellent pain relief during the first days, but that the pain returned a week later.  Howell was again prescribed OxyContin and Oxycodone.  She also complained of chronic foot pain.  Her blood pressure medications were increased in late July. [AR 401.]

Dr. Elliott noted the lack of success with the first injection and wished to schedule transforaminal epidurals at L2-3, and steroid facet joint injections at L3-4 through L5-S1 as soon as possible. [AR 277.]  On October 30, 2007, Dr. Elliott gave Howell steroid facet joint injections. [AR 275.]

By September 2007, Howell's blood pressure was well controlled with pain medications but she still complained of chronic back and foot pain.  An MRI of her hip was negative.  On September 25, 2007, Dr. Richard Miller at UNM Orthopedics saw Howell for her right foot pain. [AR 236.] Dr. Miller reviewed the x-ray and MRI scan reports but could not offer any particular injection, therapy or surgery that was likely to help, other than an AFO (ankle foot) brace to "unload the area." He prescribed the brace. [AR 236.]

In October 2007, Howell filed her SSI application.  At the time, she said she was taking care of a house in lieu of paying rent. [AR 124.]    By the end of 2007, Howell was again having trouble with hernias and saw Dr. Richard Massen with Taos Surgical Specialties for these problems. [AR 302, 306.] On December 12, 2007, Howell had a preoperative evaluation for a ventral hernia repair.

In a disability third party function report, Howell's friend Robert Bugner noted that Howell cooked and cared for her two daughters. She cut firewood, cleaned the house, drove the children to school, and hauled water to the house. [AR 137.] She fed and cared for five animals. Howell could do laundry, dishes, and household chores. She could shop three times a week and pay her bills. However, Howell could not walk without pain and was in constant pain. She had very limited mobility. [AR 137-143.]

In Howell's function report, she stated that she awoke every day and took a pain pill "to function." [AR 145.] She got her 7 year old ready for school and dressed her 3 year old. She made breakfast, got the wood and did housework. She usually had help with dinner and was sore by afternoon. Howell did not have problems with her personal care and could do yard work although she "let it go" on some days. She watched TV and read. She could no longer play with her children because of pain in her back and foot. Howell had difficulty lifting her 35 pound daughter. She used her foot brace/splint all of the time. [AR 145-151.]

On December 14, 2007, Howell's application for SSI was denied. [AR 74, 76.] On December 20, 2007, Dr. Nickerson of Disability Services, performed a physical RFC assessment. [AR 282.] She concluded, based on the record review, that Howell could lift or carry 20 pounds occasionally and 10 pounds frequently. She could sit, stand, or walk for six hours with no limitations as to pushing or pulling. [AR 283.] The injections had not helped her back pain. Dr. Nickerson summarized Howell's test results and found she had occasional limitations in her ability to climb, balance, stoop, kneel, crouch, or crawl.

### *2008 Medical Records*

In 2008, Dr. Kaufman refilled Howell's narcotic pain medications on at least a monthly basis –January 16, February 13, March 13, April 10, May 8, May 30, June 30, July 25, August 22,

September 19, October 16,  November 13, and December 11.  [AR 367-69, 370-73, 386, 387.]
Howell requested the refills due to chronic pain.

In 2008, Howell continued to see her therapist.  She admitted she was getting "cold feet"
regarding upcoming surgery for hernias.  She also was stressed by not having a car and living in
"primitive housing with no running water" and wood heat only.  Howell had to depend on the
kindness of neighbors to take her and her children to town. [AR 322.] She sometimes got a ride into
Taos at 5:30 a.m. and had to sit in the car with her younger child until day school began. [AR 322.]

On January 21, 2008, Dr. Massen performed a laparoscopic incisional hernia repair with
mesh. [AR 301, 307.] On February 13, 2008, Howell reported to Dr. Kaufman she had just had a
hernial repair but had been tossing wood onto her porch when she developed a lateral hernia at
another incision site. [AR 387.]

A CT of Howell's abdomen and pelvis, performed on March 3, 2008, indicated an
incompletely united rib fracture posteriorly on the right side.  There were also old united rib
fractures on the right side.  There was an anterior lateral wall defect on the right with a herniation
of the mesenteric fat.  An accumulation of fluid beyond the mesh protruded into the anterior pelvic
abdominal wall. [AR 309-310.] Dr. Massen followed up on the potential new hernia in March and
surmised that there was an underlying "collagen cross linking disorder" causing the hernias. [AR
300.]

In April 2008, Howell again saw Dr. Massen for her hernias and related chronic pain.  Her
history of multiple hernias and hernia repairs was discussed. [AR 299.]

On April 22, 2008, Howell's request for reconsideration of the denial of SSI benefits was
denied. [AR 75, 86.]  It is unclear whether on April 28, 2008, Howell had another procedure to

repair an incisional hernia. [AR 298.] However, the record indicates that Howell had multiple procedures to repair numerous hernias.

In a May 2008 disability report, Howell stated her right leg was worse, the cortisone shots had not helped, and her pain was worse. She could not walk any more than two blocks due to leg pain. She could not stand more than 15 minutes. Her chronic pain was limiting. [AR 183.]

Howell obtained an MRI of her back in June 2008, and the results were similar to her prior MRI. [AR 379.]

On July 9, 2008, Howell saw Dr. Massen who stated he had performed two prior herniorrhaphies on Howell. Howell complained of persistent bulging and fullness in her right mid abdomen. There was an "incarcerated mass" in the right middle abdomen that was mildly tender. Dr. Massen stated this was an unfortunate situation where Howell appeared to rapidly produce sizable hernias. They would need to get another CT scan and perhaps a specialty referral. [AR 297.]

On August 3, 2008, Howell saw Dr. Slaughter at the Santa Fe Brain and Spine Associates regarding complaints of right lower extremity pain. [AR 333.] She suffered increased pain in the last six months with standing or walking. Sitting relieved the pain. Howell had had gall bladder surgery recently in addition to hernia repair surgery. She rated her pain as an 8 of 10. She admitted to having some incontinence. Dr. Slaughter noted that Howell was positive for HTN, arthritis, and macular degeneration (although the Court did not locate a record from an ophthalmologist indicating this diagnosis). Dr. Slaughter found that her "modified disability index" was 64%. Much of her exam was normal. Her MRI revealed degenerative disease throughout the lumbar spine except for some very mild degenerative disease at L5-S1 and L1-2. The film indicated obvious scoliosis, and

degenerative spondylolisthesis[18] at L4-L5.  There was facet arthropathy at L2-3, L3-4, L4-5, and L5-S1.  Dr. Slaughter believed the right lower extremity pain was likely caused by stenosis and compression of nerve roots.  It could not be fixed easily by laminectomy.  Because of Howell's curvature of the spine, she would need fusion.  Howell's other problem was her tobacco use. [AR 335.] Dr. Slaughter explained to Howell that tobacco use was proven to decrease successful fusions by 40%.  Since fusions did not result in a 100% success rate, even without tobacco use, Dr. Slaughter explained that he had stopped operating on patients who used tobacco.  Howell would have to cease all tobacco use prior to surgery by Dr. Slaughter. [AR 335.]

A CT of Howell's abdomen and pelvis on August 22, 2008 revealed hernias and fluid collection. [AR 295.] On August 26, 2008, Dr. Massen wrote a letter addressed: "To Whom it May Concern" regarding Howell's recurrent incisional hernias. [AR 293.] The cat scan showed recurrent areas of hernias in two regions.  Howell complained of pain and tenderness.  Dr. Massen again suspected she had a collagen or some other connective tissue disorder.  He hoped she would speak to Dr. Nelson at University Hospital.  She might need a "giant prosthetic reinforcement of the abdominal wall." [AR 294.]

Dr. Kaufman signed an application for general assistance benefits with the New Mexico Income Division. [AR 385.] PCP Dr. Kaufman stated that Howell could not work due to physical problems and had a permanent restriction since 2005.  Howell suffered from lower back pain, and multiple recurrent abdominal hernias.

---

[18]"Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it."
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/ (3/21/2012).

On September 9, 2008, Howell had a procedure at Holy Cross Hospital in Taos.  They attempted an ultrasound guided cyst aspiration but could not aspirate through certain material where fluid had accumulated in Howell's abdomen. [AR 292.]

On October 3, 2008, Howell recounted her medical history in detail to her therapist.  She again stated she had macular degeneration and could not read at all. [AR 324.] Even though she took narcotic pain medications, she was always in chronic pain.  She described her pain as a 4 out of 10.  She came to counseling due to stress, frustration, anxiety, and feeling overwhelmed.  She was required to work a modified 24 hour schedule to collect welfare or ISD benefits. [AR 324.] The therapist described Howell as looking very fatigued, discouraged, and overwhelmed.

On October 16, 2008, Howell requested birth control medication from Dr. Kaufman, but Dr. Kaufman stated Howell was not a candidate for such medication due to her smoking and HTN.  She was for IUD placement. [AR 369.] On November 20, 2008, Howell had a consultation for irregular menses and contraceptive counseling.  Howell stated that she "used marijuana occasionally." [AR 382.] There is a therapy record, dated November 23, 2008, indicating that Howell stated she was reported to child protective services for "unsubstantiated allegations of drug sales out of [the] house where she and her children [were] staying."  Howell claimed the police investigated but found no evidence of drug activity. [AR 326.]

On December 3, 2008, Dr. Kaufman filled out a "Statement" regarding Howell's physical abilities and limitations for purposes of her SSI application. [AR 383.] Dr. Kaufman reported that Howell had chronic progressive lower back pain with right sided sciatic pain.  She had recurrent abdominal hernias.  She could stand or sit for 15 minutes at one time.  She could sit 60 minutes in an 8-hour workday.  Howell could not lift anything but could bend or stoop occasionally.  She could frequently balance, drive, tolerate heat and cold.  She suffered from moderate pain and was very

18

limited by her pack pain/sciatica as well as abdominal wall pain.  Howell was unable to stand or sit for long or lift/carry anything. [AR 383-84.]

Howell returned to physical therapy in December 2008, for her lower back pain and loss of strength in her right leg. [AR 434.]

### *2009 Medical Records*

Dr. Kaufman continued to prescribe narcotic painkillers for Howell on a regular basis during a good part of 2009, *e.g.,* on January 6, March 9, March 22, and May 27. [AR 361, 362, 366.] Howell was prescribed Percocet after a hernia repair in April 2009. [AR 350.] Dr. Kaufman prescribed Naproxen (anti-inflammatory) on May 31, 2009. [AR 361.]

In early 2009, Howell complained of possible seizures, and Dr. Kaufman was concerned she might have atherosclerotic[19] disease in the carotid arteries and intended to have testing done.  Howell was status post cholecystectomy.[20] Her narcotic prescription refills in January 2009 were to last five weeks since Howell had them refilled one week early. [AR 366.] While the Court did not locate a medical notation that these prescriptions were refilled in February, most likely they were.

In 2009, Howell continued to see a therapist on a regular basis.  The therapist noted Howell was suffering from many debilitating health problems and yet was still required to work for ISD. [AR 321.]  In February, the therapist observed that Howell complained of constant pain due to

---

[19]"Atherosclerosis (also known as arteriosclerotic vascular disease or ASVD) is a condition in which an artery wall thickens as a result of the accumulation of fatty materials such as cholesterol." http://en.wikipedia.org/wiki/Atherosclerosis (3/21/2012)

[20]"Cholecystectomy is the surgical removal of the gallbladder. It is the most common method for treating symptomatic gallstones."  http://en.wikipedia.org/wiki/Cholecystectomy (3/21/2012).

foot/ankle problems, back problems, and multiple hernias which continued to reherniate after repair. Howell looked exhausted, disheveled, very confused and anxious. [AR 321.]

Testing on Howell's carotids revealed bilateral atherosclerotic plaque and less than 30% stenosis. Statins and antiplatelet therapy were to be considered. [AR 365.]

Dr. Slaughter wrote to Dr. Kaufman on February 12, 2009, stating that Howell would need a fusion around the T11 level distal to pelvis. "This along with a laminectomy should help alleviate lower extremity pain issues." [AR 331.] However, again, Dr. Slaughter noted that he would not perform this type of surgery unless Howell quit smoking completely. Howell would have to be completely off tobacco, nicotine patches or nicotine gum, and Dr. Slaughter would perform "serum nicotine" testing to confirm her nicotine status. [AR 331.]

On February 17, 2009, Dr. Kaufman prescribed statin medications for Howell due to her atherosclerotic disease on her carotids. [AR 363.] Dr. Kaufman further noted that Howell's smoking complicated her hypertension, her back pain (because her surgeon would not perform surgery unless she quit smoking), and her chronic abdominal hernias (because smoking made her a poor surgical candidate). All doctors had advised her to stop smoking and while she wanted to stop smoking, she had not done so. [AR 363.] Howell told her therapist that she knew smoking was partially responsible for her hernia problems. [AR 508.]

On February 23, 2009, Dr. Catherine Ann Petty of Taos Orthopaedic Institute saw Howell, related to a new complaint of her left knee locking and giving away. Howell was status post ACL reconstruction from early 2000, but had fallen into a hole last summer and re-injured her left knee. There was very mild pain but weakness. The locking symptoms had worsened. Dr. Petty interpreted an x-ray as showing a high degree of osteoarthritis and believed Howell might need knee

20

replacement in the future.  She submitted preauthorization for an unloader brace for Howell's knee. [AR 342.]

An MRI of Howell's left knee on February 26 showed an ACL graft rupture, complex tears of the posterior horns and bodies of both menisci, medial and lateral femorotibial compartment arthrosis, Grade I chondromalacia patellae, small joint effusion, and popliteal cyst. [AR 340.]

On March 9, Dr. Petty again saw Howell for her left knee, which was worse.  The physical therapy had aggravated Howell's back and leg pain.  Dr. Petty provided Howell with the unloader knee brace and discontinued physical therapy.  They discussed surgery options and nonoperative management of the problem.  Howell did not want surgery. [AR 22.]

On March 12, 2009, Dr. Debra Solomon, a psychiatrist, performed a mental health evaluation for disability services. [AR 344-46.] Howell reported that she had been declared permanently disabled by her PCP in 2008.  She was a heavy smoker, moderate alcohol consumer, and had used crystal meth in the past, but not now. [AR 344.] Howell provided a history of her physical ailments to Dr. Solomon, but Dr. Solomon observed no psychiatric disorder.  She noted that Howell's thought process and cognition and insight/judgment were "OK," that her speech was "articulate," and her affect "full, appropriate."  After hearing about Howell's physical problems, Dr. Solomon stated that "Pt's severe ongoing pain is exacerbated by all activity which leads to need for more pain medication [illegible] then affecting memory function.  Pt clearly is disabled because of multiple complex medical problems.  I see no psychiatric disorder; pt is remarkably well-adapted." [AR 346.] At Axis IV,[21] Dr. Solomon wrote: extreme ongoing [illegible] illness and need for disability

---

[21]"Axis IV identifies recent psychosocial stressors such as a death of a loved one, divorce, losing a job, etc.  Psychosocial and Environmental Problems."  http://www.psyweb.com/DSM_IV/jsp/dsm_iv.jsp (3/21/2012).

benefits." [AR 346.] Howell needed no psychiatric treatment at that time but was welcome to return to the agency for reevaluation and treatment in the future if needed.

On April 6-7, 2009, Howell had another hernia repair procedure performed by Dr. Timothy Perez at UNM. She underwent a laparoscopic incisional hernia repair and was restricted from heavy lifting of more than 10 pounds for six weeks. [AR 350.]

During this time frame, Howell reported to her therapist that she feared she was about to be cut off from receiving her welfare check. She was told she only had two months of benefits left. Howell felt she was living on the "edge of a cliff with two small girls." [AR 500, 501.]

On August 18, 2009, the ALJ hearing was held, during which Howell was represented by a non-attorney. [AR 58.] The ALJ asked questions about Howell's prior work history, her medical care, and problems. Howell testified that she had a "back surgery coming up," and that she just had her fourth hernia operation. [AR 63.] She had scoliosis, degenerative discs, and a pinched nerve but did not need to rely on a cane. She wore a knee brace but not a back brace. [AR 63.] Howell stated she took Oxycontin for pain and that the pain medications helped. [AR 64.] Her knee pain resulted from "bone on bone" contact. Physical therapy created more pain for her and aggravated her back pain. [AR 64.] She was seeing a counselor twice a month but did not want to take any "psych meds."

Howell's non-attorney representative followed up with questions concerning Howell's back pain and limitations. Howell testified she could only sit comfortably for 30 minutes and then she needed to stand. However, she could only stand for five or ten minutes before her leg became numb. She could not walk, but could squat, bend and kneel with pain. [AR 66.] Howell could drive and drove two hours to the hearing that day, with breaks. She usually went to town every day to take her daughter to school, at which point Howell "hung out in town" to pick her up. During those hours

Howell tried to do laundry or grocery shop.  Howell had to take breaks from doing housework but had no problems with personal care needs.

Howell explained that she worked at the Human Services Department for five months until she "failed a fair hearing through the Welfare Department, and they shouldn't have been working me." [AR 68.]  She worked four hours a week and cried during work because of pain. [AR 68-69.]

Howell testified she had cut way down on her smoking and was trying to quit. [AR 69.]

A vocational expert testified about the work requirements of Howell's previous jobs as a cabinet maker's assistant and housekeeper. [AR 71.] The ALJ asked the VE to assume the hypothetical situation where an individual was 49 years of age, had 3 years of college, an RFC of sedentary work, and needed to have the "[INAUDIBLE] occasionally sitting position [INAUDIBLE] sitting and standing."  The VE appeared to testify such limitations would prevent Howell from performing her past relevant work. [AR 71-72.]

On September 18, 2009, Howell went to physical therapy for her chronic left knee pain.  A recent MRI showed the ACL was torn and needed repair.  Howell's knee was swollen.  She had very poor cardiovascular fitness.  Her potential for success was "very guarded." [AR 29.]

On October 20, 2009, the ALJ issued his adverse decision. [AR 46.] While he noted Howell's complaints of pain, he stated that she "may experience some pain but even a moderate level of pain does not mean she cannot work."  Ultimately, the ALJ relied exclusively on the grids at step five for a finding of not disabled. [AR 53.]

Howell attended physical therapy again in November.  While she felt she was stronger, the therapy had not alleviated her pain.  Howell continued to complain of pain in her knee, back and neck. [AR 28.]

On December 19, 2009, Howell had a CT scan of her abdomen and pelvis. She had gone to the emergency room for abdominal pain. The radiologist reported two ventral wall hernias and that the "infraumbilical hernia" contained fat as well as fluid. He wondered if there had been a recent surgery at that site. He noted a previous surgical repair at another cite. There was an indeterminate 1.5 cm nodule in the right adrenal gland. Howell appeared "normal post cholecystectomy." She had mild colonic diverticulosis without diverticulitis. [AR 34-35.]

There are no additional medical records of significance.

## V.   DISCUSSION

### A.   Alleged Legal Error

Howell argues that the ALJ erred in his step three findings, his step four RFC findings, and in his step five findings. [Doc. 20, at 8.]

### B.   Analysis

#### 1.   Step Three Findings

At step three, the ALJ found that Howell did not have an impairment or combination of impairments that met or equaled a listed impairment. [AR 48.] The ALJ's specific explanation for his finding was:

> The objective medical evidence fails to establish that her impairments . . . meet or equal the requirements of sections 1.02, 1.04, 4.00,[22] or any other appropriate section . . . ., as it fails to establish the required severity. In reaching this finding, I considered the opinions of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels . . . and reached the same

---

[22]Listing 1.02 is "major dysfunction of a joint(s) (due to any cause)" and is broken down into additional subparagraphs. Listing 1.04 is "disorders of the spine," including herniated nucleus pulposus, spinal stenosis, osteoarthritis, degenerative disc disease, resulting in compromise of a nerve root. Listing 4.00 refers to the cardiovascular system that is further explained and defined in a number of pages. The category of impairments begins at 4.02 (chronic heart failure).

> conclusion.  In this case, those opinions are consistent with the remaining credible medical evidence, and I therefore gave them very substantial weight.

[AR 48.]

In Clifton, 79 F.3d at 1008-1010, the Tenth Circuit Court of Appeals reversed a decision denying benefits to the claimant because the ALJ "did not discuss the evidence or his reasons for determining that [claimant] was not disabled at step three."  The ALJ's "bare conclusion" at step three was beyond meaningful judicial review and required remand.  Id. at 1009.

More recently, in Murdock v. Astrue, __ F. App'x __, 2012 WL 104878, at *1 (10th Cir. Jan. 13, 2012) (unpublished), a similar argument was made concerning the ALJ's step three findings. In that case, the ALJ made findings supported by specific evidence with respect to the claimant's back condition and depression and why those conditions did not meet the relevant listings. But, the ALJ did not discuss the evidence or provide analysis as to why the claimant's knee condition did not meet Listing 1.02. Id. Instead, the ALJ merely recited the requirements for that listing.

Here, the ALJ failed to make findings supported by specific evidence as to any of Howell's severe impairments that concerned recurring hernias, scoliosis, multi-level degenerative disc disease and degenerative joint disease of the lumbar spine, etc.  While he referred to three specific listings in the decision, the ALJ did not expressly recite requirements for any of those listings.  Instead, the step three findings are premised on reports by state agency medical consultants who conducted record reviews. [AR 48.] Notably, the Court looked for but did not locate more than one report by a state agency consultant, and there is no record citation to the "reports" in the administrative record. In addition, the ALJ made no mention of statements or opinions by Howell's primary care physician, the treating physician, or the consultative physician as to limitations and diagnoses.  The Court

25

concludes that, based on the extensive medical record concerning Howell's treatment and care, this type of step three analysis is inadequate and erroneous.

However, in Murdoch, the Tenth Circuit explained that such error at step three may be harmless.  Id. at *2.

> A step three error, such as the one in this case, does not automatically require remand. Instead, we must consider whether "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." Fischer–Ross v. Barnhart, 431 F.3d 729, 734 (10th Cir. 2005). If such findings "conclusively preclude Claimant's qualification under the listings at step three" such that "no reasonable factfinder could conclude otherwise," then any step three error is harmless. Id. at 735. If, however, there are no findings that "conclusively negate the possibility" that a claimant can meet a relevant listing, see id., we must remand to the ALJ for further findings, see Clifton, 79 F.3d at 1009–10.

In Murdoch, the Tenth Circuit found the step three error warranted remand.  The Court concluded the ALJ's error was not harmless because the ALJ made no findings elsewhere in his decision that "conclusively preclude Claimant's qualification under the listings at step three" such that "[n]o reasonable factfinder could conclude otherwise."  Id. at *3 (citing Fischer–Ross, 431 F.3d at 735).

In accordance with Fischer-Ross, the Court must next examine whether the ALJ's step four and five findings "preclude any favorable ruling for [Howell] at step three. . . ."  See Fischer-Ross, 431 F.3d at 733, 734 (analyzing whether other detailed findings by ALJ confirm rejection of the listings "in a manner readily reviewable").

The Court is not convinced that the ALJ's step four and five discussion "preclude[s] any favorable ruling for Howell" with respect to listed impairments.  The ALJ's discussion of the medical evidence and Howell's daily activities may confirm rejection of some listings, but not all pertinent listings.  The ALJ cited to the evidence that supports his analysis but did not cite to uncontroverted evidence he rejected.

26

For example, the ALJ mentioned in passing that Howell "takes medication (OxyContin) for pain and blood pressure medications" [AR 49], but omitted discussion of Howell's repeated complaints of pain and monthly refills of several narcotic pain medications over a period of several years, along with her monthly appointments with Dr. Kaufman.  The ALJ observed that Howell was not involved in physical therapy because she felt it would cause more pain, but failed to note that Howell attended many sessions of physical therapy without a reduction in her complaints of pain or use of pain medications.

The ALJ stated that Howell's PCP, Dr. Kaufman "recommended physical therapy and long-acting NSAIDs to control the pain.  Further, [s]he stated finding no reason to pursue imagining [sic], and referred the claimant to [a therapist] for counseling as the claimant self-reported being under stress due to her medical conditions and life."  [AR 50.][23]

On November 30, 2006, Dr. Kaufman stated that "ideally" Howell would be on a long acting NSAID to help control her pain and gave Howell a referral to physical therapy.  At that point, Dr. Kaufman did not see any reason to pursue imaging, but further noted that if Howell's back continued not to respond to conservative therapy, imaging would be done. [AR 411.] Dr. Kaufman also gave Howell a referral to a therapist.

 On April 11, 2007, Dr. Kaufman's treatment notes indicate that she had tried Howell on NSAIDs and six months of physical therapy "without resolution of her back pain."  As of this date, Dr. Kaufman ordered an MRI and gave Howell a referral to a back pain specialist with the hope that something could be done to alleviate Howell's pain. [AR 422.] Dr. Kaufman also gave Howell a prescription for a narcotic painkiller.  Howell was to get lab work done to determine if further

---

[23]The ALJ provided no specific cites to the lengthy administrative record for these statements/referrals by Dr. Kaufman.

"imaging" should be done.  The ALJ omitted discussing this record that demonstrates conservative treatment was unsatisfactory.

Moreover, with respect to the ALJ's comment that Howell "self-reported" life problems and stress, the physician's notes indicate that Dr. Kaufman herself observed worsening depression on the part of Howell. [AR 411.] The ALJ omitted any discussion by Dr. Kaufman as to how she had been treating Howell for several months and had seen Howell "become depressed under all the stress of her medical conditions and her life."  "She is having trouble functioning."  Dr. Kaufman started Howell on an anti-depressant that day.   The ALJ's recitation of Dr. Kaufman's findings is incomplete, if not inaccurate.

The ALJ also noted that Howell began seeing the therapist regularly from that date forward and then highlighted a single therapy note where Howell was "upset because her roommate was 'getting back' with his ex-wife and as a result, [Howell] would be out of a house to live in." [AR 50.] This record reflects one session of many with the therapist and tends to minimize Howell's complaints and concerns about being very stressed by how to care for her young daughters in the face of upcoming surgery, that she lived out of town in "primitive housing with no running water" and wood heat only," that notwithstanding pain medications, she was always in chronic pain, and the therapist's observations that Howell appeared "disheveled," "agitated," and "very fatigued." [AR 322, 324.]

The ALJ summarized treatment and testing results in July 2007 when Howell went to the Spine and Pain Institute in Santa Fe for complaints of back pain. [AR 50.] The ALJ stated that Howell denied leg pain, "and reported the back pain was *not related* to any type of prolonged period [sic] except for sitting. . . ." [AR 50] (emphasis added).  Actually, Dr. Elliott stated that Howell's pain was "constant and *related* to any type of prolonged position except for sitting."  While Dr.

Elliott began with conservative treatment, including facet joint injections, on a later date, Dr. Elliott noted that Howell's pain symptoms returned after the injections. [AR 277.] The ALJ's summary again provides just a part of the picture.

In addition, the ALJ discussed Howell's surgical repair of a hernia in April 2009, and then observed that the day following a prior hernia repair, Howell was "tossing wood onto the porch of her house and developed a lateral hernia at another incision site." [AR 51.] While accurate, the ALJ failed to note that Howell had at least four hernia repairs and that not all of them were attributed to physical activity on her part. Indeed, Dr. Massen concluded this was an unfortunate situation where a patient appeared to rapidly produce sizable hernias. [AR 297.] Dr. Massen believed a specialty referral was necessary, that Howell might have a collagen or other type of connective tissue disorder, and that she might need a "giant prosthetic reinforcement of the abdominal wall." [AR 294, 293.] Again, the ALJ's discussion of the medical record minimizes Howell's complaints and extensive medical treatment.

The Court acknowledges that an ALJ "is not required to discuss every piece of evidence" when making his decision, Clifton, 79 F.3d at 1009-10, but he must "discuss the uncontroverted evidence he [does] not [ ] rely upon, as well as the significantly probative evidence he rejects." Id. at 1010. Moreover, the Tenth Circuit found "[i]t [wa]s improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004). *See also* Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

The Court concludes that the ALJ's selective emphasis of the evidence most favorable to the his finding of nondisability and failure to discuss other extensive medical evidence to the contrary

was improper.  Thus, the Court finds that the ALJ committed error at step three because those findings are unreviewable and also because the ALJ's analysis at steps four and five did not conclusively negate the possibility that Howell met listing criteria for some impairment(s).

Moreover, the Court again comments on the ALJ's reliance at step three on solely "State Agency medical consultant" evaluations. [AR 48.] As earlier stated, there is only one state agency review that was performed in late 2007. [AR 282.]  Based a review of the medical records in December 2007, which predated much of Howell's extensive treatment, testing, and additional problems, Dr. Nickerson concluded that Howell could sit, stand or walk for six hours in the day and could occasionally lift or carry 20 pounds. [AR 283.] The form filled out by Dr. Nickerson consists mostly of checking off boxes.  However, Dr. Nickerson did summarize some of the medical records as well.

There are subsequent treating source opinions in the administrative record, at least one of which the ALJ discussed later in the written decision.  For example, the ALJ noted that Dr. Kaufman reported in September 2008, that Howell could not work due to chronic low back pain and multiple recurrent hernias, and "in December 2008 [s]he completed an interrogatory reporting that progressive low back pain, right [sic] right-sided sciatica, and recurrent abdominal wall hernias precluded the claimant performing job duties even at the sedentary level of exertion. [S]he stated that [Howell] was unable to sit or stand for long periods or lift/carry anything."  [AR 52.]

Dr. Kaufman, who saw Howell more than 35 times over a period of about 3 years, filled out a Physician's Statement in September 2008, stating that Howell was unable to work full time from 2005, due to chronic low back pain and multiple recurrent abdominal hernias. [AR 385.] In December 2008, Dr. Kaufman filled out another medical statement for social security, providing diagnoses of chronic progressive low back pain with right sided sciatica and recurrent abdominal

wall hernias. [AR 383.] Dr. Kaufman also found that Howell could stand for 15 minutes at a time, sit for 15 minutes at a time and sit in a workday for a total of 60 minutes.  She was not able to lift any amount of weight either, even occasionally.  She could occasionally bend or stoop and could perform fine manipulations of the hands, drive a car, tolerate heat and cold. [AR 383.] On the last page of the form, Dr. Kaufman noted that Howell suffered from moderate pain and wrote that she was very limited by her back pain/sciatica, as well as abdominal wall pain.  She is unable to sit or stand for long or lift/carry anything. [AR 384.]

Notwithstanding the length of the treating relationship, the attempted treatments and their success or lack thereof, the ALJ rejected Dr. Kaufman's opinions and limitations as going to the ultimate question of disability, a matter reserved to the Commissioner. [AR 52.] Thus, the ALJ apparently assigned no weight to any of Dr. Kaufman's opinions or limitations and did not mention her opinions at all at step three.  Nor did the ALJ discuss the consultative examination by psychiatrist Debra Solomon in March 2009.  [AR 344-46.] While Dr. Solomon only saw Howell on one occasion and was examining her specific to mental functioning, Dr. Solomon opined that Howell was "clearly disabled because of multiple complex medical problems." [AR 346.]

There is no mention of Dr. Slaughter's opinions at step three regarding the degree of limitation/disability Howell had.  Dr. Slaughter, a treating specialist, saw Howell several times, concluding that her "modified disability index" was 64%.  It is unclear what significance this modified disability index has, but the ALJ is empowered to have made inquiry.

Thus, in addition to the errors noted above, the Court concludes that it was improper to reject treating source opinions in conducting the step three analysis.  When the medical opinions of treating physicians are completely rejected, the ALJ must give "specific, legitimate reasons" for doing so.  The ALJ is, of course, authorized to reject testimony.  However, "[i]n choosing to reject

[an] opinion, an ALJ may not make speculative inferences from medical reports and may reject a treating physician only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Robinson, 366 F.3d at 1082 (internal citation omitted). *See* Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003) (setting out required treating physician analysis). Here, the ALJ did not provide sufficient, specific grounds for rejecting all of Dr. Kaufman's limitations or opinions and did not explain why he rejected the treating doctors' opinions at step three.

### 2.    Step Four Findings/RFC Assessment

Howell argues the ALJ made a number of erroneous and unsupported findings in his RFC analysis. She contends that his overall conclusion that Howell could perform a full range of sedentary work is not supported by substantial evidence and that the ALJ failed to properly analyze the treating physician's limitations and opinions.

The pertinent regulations define sedentary work as:

> involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

In deciding Howell could perform the full range of sedentary work, the ALJ relied on a description of Howell's daily activities [AR 49], that is both incomplete and somewhat misleading, as described above.  For example, Howell used far more pain medication on an ongoing basis than noted by the ALJ, and consistently complained of pain, to the extent that her PCP prescribed narcotic medication every month.  The ALJ omitted many medical records to this effect.  In addition, as discussed *supra*, the ALJ mischaracterized the therapist's treating records and selectively emphasized medical records favorable to the finding of nondisability.  Further, the ALJ highlighted medical records showing fewer complaints of pain by Howell or isolated notations of improvement.  He noted that Howell was doing well with physical therapy, but disregarded medical records stating Howell did not find her pain was alleviated after multiple sessions of physical therapy.  The ALJ relied on portions of MRI testing showing no significant disc herniations, but made no mention of Dr. Slaughter's opinion that, based on the complaints and medical testing, only surgical fusion of the spine and a laminectomy "should help alleviate lower extremity pain issues." [AR 331.]  The ALJ's recitation of the medical record initially appeared thorough and comprehensive.  However, a closer exam of the records showed that many records unfavorable to the ALJ's ultimate finding of nondisability were not discussed.

The ALJ primarily relied on Dr. Nickerson's RFC assessment form for the conclusion that Howell could perform a full range of sedentary work.  It is this sole checkmark-style form that expressly supports the ALJ's finding that Howell, for example, could lift up to 10 pounds and sit for six hours of a working day.  In Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987), the Tenth Circuit observed that "[s]uch [checkmark-style] evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."  Without a thorough explanation by the agency medical reviewer, such assessment forms do not constitute substantial

33

evidence.  Moreover, here, objective medical evidence to the contrary exists in the record, *e.g.,* Howell's treating physician's written statements that were either not discussed or were ignored. [AR 52.]

For all of the above-stated reasons, the Court decides that the ALJ's step four RFC findings are not supported by substantial evidence and further, that the ALJ erred by not following the sequential analysis for considering treating physician opinions as outlined in Watkins v. Barnhart, 350 F.3d 1297.

### 3.  Step Five Findings/Application of Grids

Howell argues, *inter alia*, that it was error to apply the grids where Howell's "multiple, severe physical impairments cause severe fatigue and pain requiring a need for frequent rest breaks." [Doc. 20, at 16.] As a general rule, the grids may not be used conclusively if the claimant has nonexertional limitations, such as pain or manipulative or postural limitations, that prevent her from performing the full range of work within a classification.  *See* Thompson, 987 F.2d at 1488.

Stated differently, it is well established in this circuit that "resort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain." Id.  The Tenth Circuit also recognized, however, that "[t]he mere presence of a nonexertional [pain] impairment does not preclude reliance on the grids." Id.  Instead, "[t]he pain must interfere with the ability to work." Id. Thus, "an ALJ may not rely conclusively on the grids unless he finds ... that the claimant has no significant nonexertional impairment," and the finding must be supported by substantial evidence. Id.

In this case, the ALJ noted that Howell "may experience some degree of pain or discomfort at times of overexertion, but even a moderate level of pain is not, by itself, incompatible with the performance of certain levels of sustained work activity." [AR 52.] The ALJ found that neither the

objective medical evidence, nor other non-medical evidence, established Howell's ability to function was "so severely impaired as to preclude the performance of all work activities." [AR 52.] The ALJ relied on an absence of medical evidence showing Howell had muscle atrophy or grossly abnormal neurological deficits, along with an absence of a medically determinable psychiatric impairment.

At step five, "[i]t is not [the claimant's] burden to prove she cannot work at any level lower than her past relevant work; it is the [Commissioner's] burden to prove that she can." Thompson, 987 F.2d at 1491. The ALJ may not rely on an absence of evidence of contraindication in the medical records to meet his affirmative burden of proof at step five. In relying on an omission, the ALJ "effectively shift[ed] the burden back to the claimant." Id. This was error.

The Court finds substantial evidence in the record, *e.g.*, Howell's ongoing complaints of pain, consistent treatment of pain with narcotic medications, recommended surgeries for her knee, back and recurrent hernias, x-ray, cat scan and MRI results, and treating physicians' opinions, to support a finding that Howell's pain interfered with her ability to work. The ALJ's finding to the contrary is not supported by substantial evidence. The Court concludes, therefore, that substantial evidence supports the conclusion that Howell's nonexertional limitation of pain precluded reliance on the grids at step five, that the ALJ reliance on the grids was error, and that the ALJ's decision must be reversed.

## VI.   CONCLUSION

"When a decision of the Secretary is reversed on appeal, it is within this court's discretion to remand either for further administrative proceedings or for an immediate award of benefits." Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993). In reaching this decision, the Court may consider "the length of time the matter has been pending and whether or not given the available evidence, remand for additional fact-finding would serve any useful purpose but would merely delay

the receipt of benefits." <u>Salazar</u>, 468 F.3d 615, 626 (10th Cir. 2006) (citation, internal quotation marks, and alteration omitted).

Here, Howell submitted her initial application for benefits in late 2007, almost 4½ years ago. [AR 126.] The ALJ acted without undue delay in setting the hearing, and promptly issued his decision after the administrative hearing. Indeed, only two months elapsed after the hearing before the ALJ entered his decision on October 20, 2009. However, then the Appeals Council delayed over 1½ years before issuing its denial on May 19, 2011.

The time frame for review is closed; in other words, the period of review is limited to about a two-year period, October 9, 2007 to December 1, 2009. Howell states that all relevant evidence for that time frame has been submitted, and the administrative record is extensive.

The Court concludes that a remand for additional fact-finding under the circumstances of this case would merely delay the receipt of benefits. Thus, the Court grants Plaintiff's motion to reverse and orders an immediate award of benefits for the period of October 9, 2007 to December 1, 2009.

IT IS THEREFORE ORDERED that Plaintiff Howell's motion to reverse is GRANTED, with the result that an immediate award of benefits for the period of October 9, 2007 to December 1, 2009 is to be made to Plaintiff.

Lorenzo F. Garcia
United States Magistrate Judge